IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEANI CONNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 12 C 04014 |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Beani Conner has filed a motion seeking reversal or remand of a determination by the Commissioner of Social Security ("Commissioner") denying her Disability Insurance Benefits ("DIB") (doc. # 12). The Commissioner has filed a cross-motion for summary judgment seeking to affirm the denial of benefits (doc. # 17). For the following reasons, we grant Ms. Conner's motion for remand and deny the Commissioner's motion.

## I.

We begin with the procedural history. On March 18, 2008, Ms. Conner applied for disability insurance benefits, alleging disability beginning October 1, 2003 (R. 127-32, 134). Her application was denied initially on August 15, 2008, and upon reconsideration on January 20, 2009 (R. 78-79, 80-84, 87-90). She requested a hearing before an administrative law judge ("ALJ"), which was granted, and held subsequently on January 26, 2010 (R. 92-97, 38). At the hearing, Ms. Conner

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin as the named defendant.

[2] On September 21, 2012, by consent of the parties pursuant to 28 U.S.C. § 636© and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 6, 7).

amended her onset date to October 31, 2006 (R. 43). On April 28, 2010, the ALJ issued a decision

finding that from October 31, 2006 to December 31, 2008, the date last insured, Ms. Conner was not

disabled under the Social Security Act ("the Act") (R. 21-33). The Appeals Council denied Ms.

Conner's request for review (R. 1-6), making the ALJ's decision the final decision of the

Commissioner. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We next review a brief background, a summary of the medical records during the relevant

time period, Ms. Conner's hearing testimony, and the ALJ's written decision.

### A.

Ms. Conner was born on February 1, 1972 (R. 127). She has a bachelor's degree (R. 44). She

worked as a benefits administrator for an insurance company from 1995 to 1998 (R. 46-47, 149). Ms.

Conner had also worked part-time designing jewelry and selling Tupperware (R. 45-46). She has not

worked since at least October 2006 due to "overwhelming fatigue," "a lot of muscle pain," and "brain

function issues" (R. 48-49).

### B.

Ms. Conner was involved in two car accidents in September 2001 and June 2002 (R. 208).

Between October 2002 and November 2004, she sought treatment from Dr. Bruce Montella, an

orthopedic surgeon, for neck pain, headaches, and low back pain (R. 186-195, 201-08), and in April

2003, she was diagnosed with fibromyalgia by Dr. Kathryn Eubanks (R. 198).

In November 2006, Dr. David Edelberg became Ms. Conner's primary care physician, and

at her initial visit, Ms. Conner complained that she had constant pain in her head, neck, upper back,

knees, and right hip; pain limited her range of motion such that she could not raise her arms; and her

shoulders went into spasms when she reached (R. 275). Ms. Conner also stated that she had fatigue,

2

non-refreshing sleep, and brain fog (R. 276). She reported that she had taken Lexapro, which helped slightly, and Flexeril, which was not helpful (R. 275). Dr. Edelberg noted that she had full range of motion in her extremities (R. 276). He also found that 18 out of 18 tender points on Ms. Conner were "very painful to 4.4 kg of fingertip pressure" (R. 277). Dr. Edelberg opined that Ms. Conner had "manifestations of low serotonin disorder," including depression and fibromyalgia (*Id.*).

From 2006 through 2010, Ms. Conner continued to see Dr. Edelberg regarding her fibromyalgia (R. 270-74, 336-40, 352). On November 29, 2006, Ms. Conner told Dr. Edelberg that Cymbalta and Vicodin had helped manage her pain, but that a Duragesic pain patch had caused nausea (R. 274). Dr. Edelberg prescribed a trial of Oxycontin with Vicodin for break-through pain (*Id.*). Ms. Conner told Dr. Edelberg that she was sleeping better, but she had been having lower back and pelvic pain during the prior six months that had escalated in the previous two weeks (*Id.*). Dr. Edelberg referred her to a general surgeon and prescribed physical therapy for her low back pain (*Id.*).

On January 10, 2007, Ms. Conner reported that her pain was about the same, and she was "quite tired" (R. 273). She had not started the Oxycontin because she had contracted the flu after the first dose, but that she intended to start it at that time (*Id.*). On June 5, 2007, Dr. Edelberg noted that Ms. Conner's "pain ha[d] been helped but not completely relieved by current dose of Oxycontin" (R. 272). Her fatigue was improved but her depression was "situational" (*Id.*). Dr. Edelberg increased her doses of Oxycontin and Cymbalta and prescribed a trial of Adderall XR (*Id.*).

On July 6, 2007, Ms. Conner visited Dr. Uzoma Okoli, a psychiatrist, with the chief complaint of depression (R. 228). At this examination, Ms. Conner reported feelings of sadness, excessive worrying, anhedonia, loss of energy, appetite loss, disrupted sleep, and difficulty concentrating (*Id.*). She admitted to having had thoughts of suicide two weeks prior to the visit (*Id.*). Dr. Okoli noted that

Ms. Conner was coherent, fully communicative, and that her language skills were intact, but that she had signs of moderate depression and her demeanor was sad (R. 229). Further, Ms. Conner's short and long-term memory were intact, and she had the ability to abstract and do arithmetic calculations (*Id.*). Dr. Okoli diagnosed Ms. Conner with "major depressive disorder, recurrent," and prescribed Effexor and Klonopin (*Id.*). In a follow-up visit on July 30, 2007, Dr. Okoli noted that Ms. Conner had not yet responded to treatment, though she had not started the Effexor as recommended and wanted to go back on Lexapro (R. 230). Dr. Okoli maintained the same diagnosis and prescribed Klonopin and Lexapro (*Id.*).

At an April 7, 2008 appointment with Dr. Edelberg, Ms. Conner reported that her fibromyalgia pain was "good and bad: so much better on the medication," but "very (very!!)" severe without it (R. 270). Eighteen out of eighteen points on her body remained very tender, and Dr. Edelberg increased her dose of Oxycontin to 30 mg every 12 hours, with three Vicodin a day (*Id.*). With regard to her fatigue and depression, Ms. Conner reported that she was "doing better" on Lexapro and did not want to increase her Adderall XR prescription because of side effects (*Id.*). Ms. Conner complained that she had "increased pain in the small joints of the hands, knees and feet," though a joint exam was negative (*Id.*). Dr. Edelberg noted that she might have inflammatory arthritis (*Id.*). Ms. Conner described continuing insomnia, with Lunesta helping but sometimes failing to remain effective throughout the night (*Id.*).

In connection with Ms. Conner's social security application, a number of state agency consultants opined on her physical and mental condition. On July 7, 2008, Dr. Scott Kale, an internist, conducted a physical examination of Ms. Conner for the Bureau of Disability Determination Services ("DDS"); Dr. Kale reported that he "spent 38 minutes with this claimant reviewing forms, formulating and dictating the evaluation report" (R. 282-85). Ms. Conner told Dr. Kale that she had

4

such severe fatigue and fibromyalgia tenderness that even showering inflicted pain (R. 283). Dr. Kale noted that Ms. Conner's cervical spine, shoulder, elbow, wrist, and finger motion were normal, she had 5/5 grip strength, and she had no clubbing, cyanosis, or edema in her extremities (R. 284). Ms. Conner was able to stand up from a chair using both hands; she could stand on her heels and toes; and her gait was not antalgic (Id.). Ms. Conner had no atrophy, and her range of motion in her knees, ankles and hips was normal (Id.). In her lumbar spine, Ms. Conner had 50/60 flexion, 20/25 extension, and 20/25 lateral bending (Id.). Dr. Kale observed that Ms. Conner had tenderness in 18/18 tender points, fibromyalgia, hypertension, and "[f]ibro-fog by report, but no apparent cognitive abnormalities on examination" (R. 284-85).

On July 18, 2008, DDS physician Dr. Francis Vincent completed a residual functional capacity ("RFC") assessment of Ms. Conner based on Dr. Kale's examination, but without any treating or examining source statements (R. 287-94). Dr. Vincent opined that Ms. Conner could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour workday, with an unlimited ability to push or pull and no postural, manipulative, or environmental limitations (R. 288-91). Dr. Vincent relied on Dr. Kale's findings that although Ms. Conner had 18/18 tender points and pain in her hands and knees, she had normal range of motion in all her joints with no atrophy, grip strength of 5/5, and normal gait (Id.). Dr. Vincent deemed Ms. Conner's allegations "partially credible" and stated that he had taken her pain into consideration (Id.). On January 15, 2009, Dr. Towfig Arjmand, a DDS medical consultant, reviewed the record and affirmed Dr. Vincent's RFC assessment, finding Ms. Conner capable of work at the light exertional level (R. 333-35).

On August 4, 2008, another state agency consultant, Michael Stempniak, Ph.D., a clinical psychologist, conducted an in-person psychological examination of Ms. Conner (R. 296-300). Ms.

Conner reported that her relationship with her husband was strained because he wished to return to a church, which she believed was a cult (R. 297). Ms. Conner also stated that her sleep was not very good and she had previously had thoughts about suicide, but that she had taken no action and had no intentions (R. 298). Dr. Sternpiak noted that Ms. Conner was oriented and that her memory was in the average range (*Id.*). Dr. Sternpiak reported that Ms. Conner seemed to meet the criteria for "Major Depressive Disorder, recurrent, mild" (R. 299-300).

On August 14, 2008, Kirk Boyenga, Ph.D., another state agency consultant, completed a "Psychiatric Review Technique" for Ms. Conner (R. 301-14). Dr. Boyenga concluded that Ms. Conner had mild depression and mild anxiety, which caused mild difficulties in maintaining social functioning and concentration, persistence, or pace, but caused no restriction in activities of daily living and no episodes of decompensation (R. 304, 306, 311). Dr. Boyenga concluded that Ms. Conner had a medically determinable illness, but that her allegations were only partially credible and there was little evidence to suggest that she had a severe mental illness (R. 313).

On December 10, 2008, Dr. Edelberg prepared an "Arthritic Report (Degenerative or Inflammatory)" regarding Ms. Conner and diagnosed her with "severe fibromyalgia; pelvic floor dysfunction; [and] diffuse inflammatory arthritis of joints" (R. 323-26). He stated that her complaints were pain, tenderness, stiffness, fatigue, fever, malaise, and weight loss (*Id.*). He also noted that she had edema and had 2 out of 5 grip strength in both hands (*Id.*). Dr. Edelberg also reported that Ms. Conner had significant limitations in doing repetitive reaching, handling, fingering, grasping, turning, and twisting objects, along with difficulties in holding utensils, combing her hair, and turning a door knob (R. 324). He reported that she had difficulty with both shoulder level and overhead reaching and that her hands had 80° extension and 50° flexion (*Id.*). Dr. Edelberg opined that Ms. Conner is not able to lift and/or carry ten pounds; that she would need to include periods of walking around

6

during an 8 hour day; and that she could only sit or stand for one hour at a time (*Id.*). Dr. Edelberg wrote:

> Patient is mainly disabled by extremely severe fibromyalgia and pelvic floor dysfunction (likely due to the fibromyalgia as well). She has all clinical findings consistent with fibromyalgia (extremely severe 'tender' points, chronic fatigue, unrefreshing sleep). However, in addition to her fibromyalgia[,] she has ANA positive inflammatory arthritis of her hands.[3]

(R. 326).

That same day, Dr. Edelberg completed a "Fibromyalgia Residual Functional Questionnaire" (R. 327-28). He listed Ms. Conner's symptoms from fibromyalgia as multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, subjective swelling, depression, female urethral syndrome, numbness and tingling, lack of endurance, impaired concentration, frequent severe headaches, and cognitive impairment (R. 327). He also noted that she had bilateral pain in her spine, chest, shoulders, arms, hands, fingers, hips, legs, knees, ankles, and feet (*Id.*). Dr. Edelberg reported that changing weather, movement, overuse, stress, static positions, and fatigue all triggered pain and that her claims of fatigue and pain were credible (R. 327-28). Dr. Edelberg reported that the fatigue and pain frequently affected Ms. Conner's concentration and attention and that she had a marked limitation in her ability to deal with work stress (R. 328). He opined that Ms. Conner would need to lie down during a work shift and that she would likely be absent from work more than three times a month (*Id.*). In addition, he wrote, "She is experiencing severe chronic musculoskeletal

---

[3] "The immune system makes an abundance of proteins called antibodies. Antibodies are made by white blood cells and they recognize and combat infectious organisms in the body. Sometimes these antibodies make a mistake, identifying normal, naturally-occurring proteins in our bodies as being 'foreign' and dangerous. The antibodies that target 'normal' proteins within the nucleus of a cell are called antinuclear antibodies (ANA). ANAs could signal the body to begin attacking itself which can lead to autoimmune diseases." *Antinuclear Antibodies (ANA)*, American College of Rheumatology, http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Antinuclear_Antibodies_(ANA)/ (last visited April 30, 2014).

pain not only in her fibromyalgia tender points but with her urethral syndrome and pelvic floor dysfunction, has constant discomfort in the bladder and pelvic area" (*Id.*).

On March 17, 2009, Ms. Conner again visited Dr. Edelberg (R. 336). She informed him that in recent months her pain had not been well controlled despite the increase in her pain medicine and that she was very depressed because of her worsening condition, which she attributed to the stress caused by "uncontrolled pain, lack of being able to work gainfully, and issues with her marriage" (*Id.*). Dr. Edelberg noted that all 18 of her fibromyalgia points were "extremely tender" (*Id.*). He assessed her condition as severe fibromyalgia that was poorly controlled and increased her Oxycontin dose to 40 mg, with Vicodin for break-through pain (*Id.*). Dr. Edelberg observed that Ms. Conner was "having a lot of difficulty affording her meds," and concluded that overall, she was "becoming increasingly disabled by her severe pain and fatigue" (*Id.*).

At a January 12, 2010 appointment with Dr. Edelberg, Ms. Conner reported that her pain was very severe and had progressively worsened over the previous seven years (R. 352). Dr. Edelberg prescribed Savella, in addition to the Oxycontin and Vicodin prescriptions (*Id.*). Ms. Conner also told Dr. Edelberg that she had a "lot of depression" and her anxiety was "really crippling," including panic attacks in crowds (*Id.*).

## C.

On January 26, 2010, a hearing was held before an ALJ at which Ms. Conner, who was represented by counsel, was the only witness (R. 38-39). Ms. Conner testified that she has been unable to work since at least October 2006 because of overwhelming fatigue, non-restorative sleep, fevers, and flu-like muscle pain (R. 48). She also stated that one day she had trouble climbing the stairs and thought she was going to fall because her legs gave out (*Id.*). In addition, she began having issues with her brain functions at work, such as problems thinking and concentrating (R. 48-49). She

8

testified that she currently had pain throughout her whole body and that she felt like she had a bad flu every day, "where it's like everything down to your toes and your hands just ache" (R. 52).

In rating her pain, Ms. Conner stated that without her medications (Oxycontin and Vicodin, among others), her pain would be a ten out of ten "all day every day" (R. 52). With her medications, her pain is about a three or four out of ten, if she is sitting still; but her pain goes up to a five or six on a good day, and to seven or eight on a bad day, if she is up and doing anything (R. 55). Ms. Conner testified that her pain is unpredictable, and on some bad days, she cannot even get out of bed (*Id.*). She also noted that she is not refreshed after sleep, even though she usually is in bed for twelve to sixteen hours, and once or twice a week, she takes a nap for several hours during the day (R. 56-57).

Ms. Conner testified that she used to have a "genius I.Q.," but that she has had trouble concentrating and thinking since she became sick and now has a lot of memory problems (R. 58-59). She used to read and have a good vocabulary, but she no longer does (R. 66). She also is constantly depressed and anxious, and her depression and anxiety are getting worse (R. 60).

Ms. Conner testified that she only visits with Dr. Edelberg every four to six months because she has not had insurance since her husband lost his job in March 2008 (R. 62). She stated that she has had to put off some of Dr. Edelberg's recommendations, such as seeing a chiropractor, because she has not been able to afford them (R. 65).

Ms. Conner's daily activities, on average, consist of giving her cat water, watching television, and opening the mail (R. 57-58). Ms. Conner testified that she usually does not go to church or attend family events because of her health (R. 67-68). She also stated that she has not seen her sister in over a year and a half and has lost friends because she has not had the energy to go to see them (R. 68-69). Ms. Conner does not go grocery shopping very often because it is difficult for her to carry

the groceries, and she has panic attacks in most big stores (R. 69). She does not often cook, clean, or do laundry, and she "very rarely" uses the computer because typing hurts (R. 71-72). She only showers once or twice a week, and sometimes she cannot brush her teeth because of the pain and nausea (R. 73).

### D.

In a written opinion dated April 28, 2010, the ALJ found that Ms. Conner was not disabled under the Act from her alleged onset date of October 31, 2006 through December 31, 2008, her date last insured (R. 21-33). The ALJ applied the five-step sequential inquiry for determining disability set forth in 20 C.F.R. § 404.1520(a)(4). At Step 1, the ALJ found that Ms. Conner had not engaged in substantial gainful activity from October 31, 2006 through December 31, 2008 (R. 23). At Step 2, the ALJ determined that Ms. Conner's fibromyalgia, hand and knee pain, and depression/anxiety were all severe impairments (*Id.*).

At Step 3, the ALJ found that Ms. Conner's impairment or combination of impairments did not meet or medically equal a listed impairment (R. 23-24). The ALJ reasoned that Ms. Conner could "walk without assistance, perform her personal hygiene, shower, work on the computer, feed herself, and drive," and could communicate in an effective manner, with physical and psychological consultative examinations showing intact memory, judgment, and insight (R. 24). In addition, the ALJ explained that Ms. Conner's mental impairment did not satisfy the paragraph B criteria, because Ms. Conner was only mildly restricted in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and she had no episodes of decompensation (*Id.*).

The ALJ determined that Ms. Conner had the RFC "to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)" (R. 25). To support this assessment, the ALJ first recounted

10

Ms. Conner's testimony and reviewed the history of her medical treatment (R. 25-30). The ALJ then based the RFC assessment "in large part" on the opinion of Dr. Kale, to which he gave "great weight for his extensive physical consultative examination" (R. 30). He also gave "significant weight" to Dr. Stempniak's psychiatric consultative examination and "some weight" to the opinions of treating physicians Dr. Okoli, Dr. Johnston,[4] Dr. Woods,[5] Dr. Eubanks, and Dr. Montella (*Id.*). He gave "less weight" to the opinions of Dr. Arjmand, Dr. Boyenga, and Dr. Vincent because they did not examine Ms. Conner (R. 30-31).

With regard to Ms. Conner's primary treating physician Dr. Edelberg, the ALJ explained that while he gave Dr. Edelberg's opinion "substantial weight," he discounted it because there was "little evidence of any clinical or laboratory findings supporting [Dr. Edelberg's] opinion" that Ms. Conner had severe fibromyalgia and was unable to work (R. 30). The ALJ stated that Dr. Edelberg's treatment notes "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if in fact the claimant were disabled," noting that, in contrast, the consultative examinations were "essentially normal, with good range of motion, good motor strength, and no cognitive deficiencies" (R. 31). The ALJ opined that Dr. Edelberg might have relied too heavily on Ms. Conner's subjective complaints of the severity of her symptoms, and that Dr. Edelberg had even noted that she was "overmedicated with pain medications" (*Id.*).

The ALJ also concluded that Ms. Conner's complaints were "not credible to the extent they are inconsistent with the above [RFC] assessment" (R. 31). In support of this conclusion, the ALJ

---

[4] In October 2007, Dr. Edelberg had referred Ms. Conner to Dr. William Johnston, a urology specialist at Northwestern University, to address her continued complaints of bladder pain (R. 248). Dr. Johnston reported that Ms. Conner had glucose in her urine and recommended a work-up with Dr. Edelberg to ascertain whether she had diabetes (*Id.*).

[5] In October 2006 and January 2007, treatment notes indicate that Ms. Conner visited the gynecology practice of Dr. William Woods and Dr. Carmen Woods in Park City, Illinois, where she complained of abdominal and pelvic pain and urinary frequency (R. 257).

explained that "it is difficult to consider [Ms. Conner] totally disabled when she is able to walk without assistance, drive a car, work on a computer, perform her own hygiene, feed herself, dress and undress herself, shower on her own, and occasionally go shopping or do light household chores" (*Id.*). The ALJ also found that despite a treatment record for fibromyalgia and related pain, none of the medical evidence substantiated her allegations of constant, high level pain (*Id.*). He opined that Ms. Conner's complaints of extreme pain "appear to be somewhat exaggerated; and seem to have worsened at about the time the claimant applied for disability benefits" (*Id.*). The ALJ deemed Ms. Conner's description of the severity of her pain "so extreme as to appear implausible" (*Id.*). The ALJ found that the objective medical evidence, "the conservative nature of [Ms. Conner's] course of treatment," and her "own acknowledged level of daily activity" all supported an RFC of sedentary work (*Id.*).

At Step 4, the ALJ determined that Ms. Conner was capable of performing her past relevant work as a benefits administrator (R. 31). He noted that Ms. Conner could perform the responsibilities of this position, which involved work that was primarily performed while sitting and required insurance and computer knowledge, as well as communication skills (*Id.*). The ALJ also made alternative findings at Step 5, noting that Ms. Conner could perform other jobs in the national economy (R. 32). Consequently, the ALJ concluded that Ms. Conner was not disabled from October 31, 2006 through December 31, 2008 (*Id.*).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning that a reasonable person would find the evidence adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). We do not reweigh the evidence or substitute our own judgment for that of the ALJ. *Id.* at 362. In rendering a decision, the ALJ "must build a logical

bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id.*

Ms. Conner contends that the ALJ erred by: (1) improperly assessing her credibility; (2) failing to supply a medical basis for the RFC finding of sedentary work; (3) failing to call a vocational expert ("VE") to testify; (4) improperly relying on the Medical-Vocational Guidelines; and (5) failing to give proper weight to Dr. Edelberg's opinion (doc. # 13: Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") at 7-13). For the reasons that follow, we find that the ALJ failed to offer a sufficient basis for discounting Ms. Conner's credibility, and therefore grant Ms. Conner's motion for reversal and remand on that basis.

## A.

Ms. Conner asserts that the ALJ erred in finding that she was not credible by relying on boilerplate, mischaracterizing her testimony, and improperly emphasizing the lack of objective evidence to support her claims of debilitating pain (Pl.'s Mem. at 7-9; doc. # 19: Plaintiff's Reply Brief ("Pl.'s Reply") at 1-2). While we review an ALJ's credibility determination deferentially and uphold it unless it is "patently wrong," the ALJ still must "build an accurate and logical bridge between the evidence and the result." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). We consider whether the ALJ's reasons for discrediting testimony are "unreasonable or unsupported." *See, e.g.*, *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). And "if 'the determination rests on objective factors or fundamental implausibilities rather than subjective considerations' like demeanor, we 'have greater freedom' in reviewing the decision." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (per curiam) (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)); *see Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). "An erroneous credibility finding requires remand unless the claimant's testimony is

incredible on its face or the ALJ explains that the decision did not depend on the credibility finding."

*Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (citing *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).

Ms. Conner contends that the ALJ erred by reciting the oft-maligned yet continuously-used boilerplate phrase: "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (Pl.'s Mem. at 7-8, citing R. 31). The Seventh Circuit has made plain that this worn incantation is useless, but only warrants reversal if the ALJ offers nothing more in support of a credibility determination. *See, e.g., Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("[i]f the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless"). The ALJ must support his credibility determination with specific evidence in the record, *Shauger*, 675 F.3d at 696, and must consider several factors, "including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing C.F.R. § 404.1529(c); S.S.R. 96-7p).

Here, the ALJ proceeded beyond the boilerplate and explained that he discounted Ms. Conner's credibility based on her activities of daily living; his view of the implausibility of the severity of her alleged pain in contrast to the lack of objective clinical findings to substantiate her claims; and the timing of the worsening of her impairments, which he viewed as suspicious (R. 31). However, as we explain below, the ALJ's explanation of his credibility finding misstated some evidence and overstated the importance of the lack of objective evidence in this case. Those flaws in his credibility assessment warrant remand.

14

**1.**

Ms. Conner argues that the ALJ mischaracterized her testimony in supporting his credibility determination (Pl's. Mem. at 8). We agree. The ALJ noted that while Ms. Conner's daily activities are "somewhat limited," she could not be considered "totally disabled when she is able to walk without assistance, drive a car, work on a computer, perform her own hygiene, feed herself, dress and undress herself, shower on her own, and occasionally go shopping or do light household chores" (R. 31). We find that this discussion fails to accurately reflect Ms. Conner's testimony regarding the limitations she experienced in her daily activities.

Ms. Conner stated that she had significant difficulty taking care of her personal hygiene since her pain is aggravated when she lifts her arms to shampoo her hair or brush her teeth, and that the water from the shower causes her pain (R. 72-73, 283). As a result, Ms. Conner only showers once or twice a week; she cuts her hair short so that she can more easily manage it; and she does not brush her teeth until the afternoon or night when she has the energy to do so and is not feeling nauseous (R. 73). Ms. Conner also testified that she is unable to go grocery shopping very often because it is difficult for her to take the items off shelves and carry them, and when she does go, she uses a motorized riding cart (R. 69-70). The ALJ's observation that Ms. Conner can "work on a computer," (R. 31) similarly overstated Ms. Conner's testimony, which was that she "very rarely" works on the computer because "it hurts for [her] to type" and that she is "late on a lot" of her bills, because she "just can't muster up the energy to like pay one bill online" (R. 71-72).

An ALJ must justify his credibility conclusions with specific reasons that are supported by the record; an ALJ may not build an adverse credibility determination upon an erroneous recounting of the record. *See, e.g., Pierce*, 739 F.3d at 1050 (credibility finding that "misstated some important evidence and misunderstood the import of other evidence" required remand); *Terry v. Astrue*, 580

F.3d 471, 477-78 (7th Cir. 2009) (mischaracterizations of the record undermined ALJ's adverse

credibility determination); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (remand

required where ALJ had mischaracterized and overlooked key evidence). In addition, the Seventh

Circuit "has repeatedly cautioned that a person's ability to perform daily activities, especially if that

can be done only with significant limitations, does not necessarily translate into an ability to work

full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The ALJ's reliance on Ms. Conner's

ability to perform some daily activities fails to take into account that daily living tasks can be flexibly

scheduled and do not require a minimum standard of performance, unlike full-time work. *Bjornson*

*v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Ms. Conner's "ability to struggle through the activities

of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio*

*v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Further, Ms. Conner's testified that since she has been

sick, she sleeps at least twelve and up to sixteen hours a night and takes five-hour naps once or twice

a week (R. 56-57). In light of this testimony, which the ALJ does not suggest is fabricated, the ALJ

has not adequately explained how Ms. Conner has the ability to work even a sedentary job full-time

since "'one does sedentary work sitting . . . but not lying down.'" *Roddy*, 705 F.3d at 639 (quoting

*Bjornson*, 671 F.3d at 646).

## 2.

The ALJ also relied on the lack of objective evidence in discounting Ms. Conner's claims of

debilitating pain, noting, for example, that the medical and psychiatric consultative examinations

were "essentially normal," and that "Dr. Edelberg's notes fail to reveal the type of significant clinical

and laboratory abnormalities one would expect if in fact the claimant were disabled" (R. 31). The

ALJ found Ms. Conner's allegations of extreme pain unsubstantiated "by any of the clinical medical

evidence" (*Id.*). But "[a]n ALJ may not discount a claimant's credibility just because her claims of

16

pain are unsupported by significant physical and diagnostic examination results." *Pierce*, 739 F.3d at 1049-50 (citing SSR 96–7p(4); *Bjornson*, 671 F.3d at 646; *Myles v. Astrue*, 582 F.3d 672, 676–77 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)). "Pain can be severe to the point of being disabling even though it is entirely in the claimant's mind." *Goble v. Astrue*, 385 Fed. App'x 588, 592 (7th Cir. 2010) (citing *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Sims v. Barnhart*, 442 F.3d 536, 537–38 (7th Cir. 2006); *Carradine*, 360 F.3d at 753–54)); *see also Pierce*, 739 F.3d at 1050.

Moreover, the ALJ's analysis does not account for the fact that fibromyalgia is a disorder characterized by unverifiable symptoms and a lack of objective diagnostic criteria. As the Seventh Circuit has explained in describing this "elusive and mysterious" disease:

> [fibromyalgia's] symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *see also Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (noting that fibromyalgia is "a chronic condition that causes pain all over one's body, as well as fatigue and tenderness. Fibromyalgia is difficult to diagnose, for the symptoms vary depending on both the person and the time and circumstances of any given day"); *Groskreutz v. Barnhart*, 108 Fed. App'x 412, 416-17 (7th Cir. 2004) (ALJ erroneously discounted objective (trigger-points) and subjective (pain complaints) evidence of fibromyalgia because claimant's doctors did not observe muscle atrophy or deficiencies in mobility). To the extent that objective evidence exists for fibromyalgia, Dr. Edelberg and Dr. Kale both found that Ms. Conner had 18 out of 18 tender points on her body (R. 270, 277, 284, 336). *See Weitzenkamp v. Unum Life Ins. Co. of*

*America*, 661 F.3d 323, 331 (7th Cir. 2011) ("the trigger test can 'more or less objectively' establish the disease where the findings of the test are consistent with fibromyalgia"); *see also Weitzenkamp v. Unum Life Ins. Co. of America*, 500 Fed. App'x 506, 507 (7th Cir. 2013) ("[b]ecause [plaintiff] underwent a 'trigger test'—a test where a doctor presses down on 18 fixed locations on the patient's body to determine whether the patient has fibromyalgia—we concluded that the diagnosis was supported by objective medical evidence").

In arguing that the ALJ properly discounted Ms. Conner's subjective claims of pain, the Commissioner contends that the ALJ had also noted that the "conservative" nature of Ms. Conner's medical treatment, which "was inconsistent with symptoms so extreme as to be disabling" (doc. # 18: Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 6 citing R. 31). The ALJ did not elaborate on the observation about the nature of Ms. Conner's treatment, or why he considered it to be conservative. The ALJ did state that Dr. Edelberg was treating Ms. Conner's pain and depression with prescription medications, including Oxycontin, Vicodin, Celexa, Ativan, Celebrex, Flexeril, Restoril, and Savella, and presumably deemed this a conservative course of treatment (R. 30). To the extent Ms. Conner did not follow other treatment measures that Dr. Edelberg recommended, such as physical therapy, x-rays, or chiropractor visits, Ms. Conner had testified that she was unable to afford those treatments because her husband had lost his job and his insurance (R. 62-65).

In summarily labeling Ms. Conner's treatment as conservative, the ALJ did not reveal why he concluded that Ms. Conner's treatment with an array of prescription medications was conservative and whether he accounted for her explanation of why she did not pursue additional treatment options An ALJ must consider reasons for a claimant's lack of treatment (such as an inability to pay) before drawing negative inferences about the credibility of a claimant's professed symptoms. *See Pierce*,

739 F.3d at 1050 (an ALJ may not "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Roddy*, 705 F.3d at 638; *Myles*, 582 F.3d at 677 ("Inability to pay for medication . . . may excuse failure to pursue treatment" (citing SSR 96–7p)). On this point, because the ALJ failed to articulate the basis for his conclusion, we cannot know if the ALJ considered whether cost prohibited Ms. Conner from pursuing more extensive treatment options. Consequently, the unsupported and unexplained statement regarding the "conservative nature" of Ms. Conner's treatment does not supply a proper basis for discounting Ms. Conner's claims.

In addition, the ALJ stated that Ms. Conner's "allegations of extreme pain appear to be somewhat exaggerated," that the "description of the severity of her pain has been so extreme as to appear implausible," and that the worsening of her condition coincided with her application for benefits (R. 31). In so stating, the ALJ did not address how those conclusions meshed with evidence that substantiated Ms. Conner's claim of extreme pain, such as the fact that Ms. Conner's doctors prescribed multiple, powerful pain medications in an effort to manage her symptoms. The Seventh Circuit has deemed it improbable that a claimant would undergo pain-treatment procedures, such as heavy doses of strong drugs, in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking. *See Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 646 (7th Cir. 2007); *Carradine,* 360 F.3d at 755. An ALJ may not overlook evidence that contradicts his decision, *Bates*, 736 F.3d at 1099, and here, the ALJ found Ms. Conner's claims of pain implausible without ever addressing the fact that her doctors had responded to those claims by prescribing an array of strong drugs. And, the ALJ failed to explain why the claimed worsening of Ms. Conner's condition at the time she applied for benefits undermined her

credibility – one would expect that an applicant would not seek benefits until she thought her condition warranted it.[6]

**B.**

Because the ALJ based his credibility finding on observations that are unreasonable and unsupported, we reverse and remand. The ALJ's flawed credibility assessment cannot be deemed harmless "unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce*, 739 F.3d at 1051; *see Allord*, 455 F.3d at 821. The medical evidence does not render Ms. Conner's testimony incredible on its face, and we cannot be sure that the ALJ would have reached the same ultimate conclusion with a different credibility determination.

Because we reverse on this ground, we need not reach Ms. Conner's remaining arguments. Upon remand, however, the ALJ should revisit the weight to attribute to Dr. Edelberg's opinion, reassess Ms. Conner's residual functional capacity after a new evaluation of Ms. Conner's credibility, and may need to reconsider whether vocational expert testimony is required.[7]

---

[6] On review before this Court, the Commissioner offers two additional reasons to discount Ms. Conner's credibility, contending that her claim of a worsening condition contradicted her earlier statements that her condition had not changed and that Ms. Conner was not always compliant with her medication (Def.'s Mem. at 6). The ALJ did not support his credibility determination with either of these reasons, however, and, "[u]nder the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Consequently, we do not consider those points – although on remand the ALJ is free to do so.

[7] If the ALJ finds that Ms. Conner's non-exertional limitations, including pain, depression and anxiety, substantially reduce the range of work she can perform, the ALJ should consult a vocational expert. *See Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see also Lippart v. Barnhart*, 63 Fed. App'x 260, 266 (7th Cir. 2003).

## CONCLUSION

For the reasons set forth above, we grant Ms. Conner's motion for remand (doc. # 12), and deny the Commissioner's motion to affirm (doc. # 17). The case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: May 2, 2014